IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|      Plaintiff, | |
| v. | |
| 402,817.931 TETHER VIRTUAL CURRENCY SEIZED FROM BINANCE HOLDINGS LTD. CRYPTOCURRENCY EXCHANGE ACCOUNT WALLET 0x9510c00aaac3561ef75f7b111edcba1278333b6 FOR BINANCE USER ID 130389609, | |
| 17,922.491314 TETHER VIRTUAL CURRENCY SEIZED FROM BINANCE HOLDINGS LTD. CRYPTOCURRENCY EXCHANGE ACCOUNT WALLET 0xf85db42fc79b153eac3725f0382fadaa34bae40a FOR BINANCE USER ID 100785154, | Civil No. 3:25-cv-_713_ |
| and | |
| 1,249,996.15 BINANCE USD VIRTUAL CURRENCY SEIZED FROM BINANCE HOLDINGS LTD. CRYPTOCURRENCY EXCHANGE ACCOUNT WALLET 0xf85db42fc79b153eac3725f0382fadaa34bae40a FOR BINANCE USER ID 100785154, | |
|      Defendants *in Rem*. | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the plaintiff, United States of America, by and through its counsel, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, and Kevin Hudson, Assistant United States Attorney, and brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

**NATURE OF THE ACTION**

1.      The United States brings this action *in rem* seeking the forfeiture of all right, title, and interest in the defendants *in rem* identified in the case caption above (collectively, the "Defendant Property").

2.      The United States' claim arises from an investment fraud scheme perpetrated against numerous individual victims.  As described in more detail below, co-conspirators used social engineering to convince victims to "invest" in fraudulent cryptocurrency investment websites, which in fact funneled victim funds to those perpetrating the fraud, who then laundered those funds as described in this Complaint.

3.      The Defendant Property constitutes proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  The Defendant Property also constitutes property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering) and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

4.      In sum, this is a case about clearing title to the Defendant Property, that is, monies swindled from victims through fraud and subsequently laundered, with the end goal of returning those monies to victims through the Department of Justice's remission process.

**THE DEFENDANTS IN REM**

5.      Defendant 402,817.931 Tether (USDT) virtual currency was seized from Binance Holdings Ltd. ("Binance") wallet address 0x9510c00aaac3561ef75f7b111edcba1278333b6 on January 27, 2023, and subsequently was transferred to a cryptocurrency wallet controlled by the United States Secret Service ("USSS") on February 27, 2023.

6.      Defendant 17,922.491314 USDT virtual currency was seized from Binance wallet address 0xf85db42fc79b153eac3725f0382fadaa34bae40a on January 27, 2023, and subsequently was transferred to a USSS-controlled cryptocurrency wallet on March 21, 2023.

7.      Defendant 1,249,996.15 Binance USD ("BUSD") virtual currency was seized from Binance wallet address 0xf85db42fc79b153eac3725f0382fadaa34bae40a on January 27, 2023, and subsequently was transferred to a USSS-controlled cryptocurrency wallet on March 21, 2023.

8.      The property described in paragraphs 5 through 7 above are collectively the Defendant Property.  The Defendant Property is currently in the possession of the United States Secret Service in Washington, D.C.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over actions commenced by the United States under 28 U.S.C. § 1345, and over forfeiture actions under 28 U.S.C. § 1355(a) and (b).

10.     This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b)(1)(A) because certain of the acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

11.     Venue is proper within this judicial district under 28 U.S.C. § 1355(b)(1)(A) because certain of the acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

## FACTUAL ALLEGATIONS

A.      The Cryptocurrency Investment-Fraud Scheme

12.     This Complaint involves criminal syndicates operating cryptocurrency investment fraud schemes. The scammers promoted spoofed domains and websites purporting to look like

3

legitimate cryptocurrency trading platforms to U.S. victims. Scammers then fooled victims into "investing" in cryptocurrency through these fraudulent investment platforms, which instead allowed the scammers to steal their money.

13.    This type of scam involves scammers spending significant time getting to know and grooming their victims to gain their confidence. After developing a relationship and gaining trust, scammers instruct their victims to visit the spoofed domains to get them to make significant capital investments in what victims believe are legitimate cryptocurrency trading platforms. The victims are then typically asked to invest their funds via a provided cryptocurrency deposit address.  While the scammers prefer cryptocurrency deposits, they will also accept bank wires if the victim cannot transfer cryptocurrency.

14.    As part of the scheme to defraud, the victims were told that they can expect to make a sizeable return on their investments. As investments were made, the spoofed websites falsely displayed a significant increase in the victim's account balance, which encouraged the victim to continue making investments. When the victim attempted to make a withdrawal, the scammers often attempted to coerce the victims to send even more funds. These tactics included requesting additional deposits due to "significant profits" gained on the account or other reasons such as freezing the account due to "taxes owed" or "suspicious behavior." Regardless of how the scammers attempted to solicit additional investments from the victims, the victims were unable to recover their investment.

15.    Once it obtained the victims' funds, the syndicate utilized various money laundering techniques to conceal the nature, source, and origin of the victim funds. These techniques included the use of money couriers, commercially unnecessary numbers of financial transactions, pooling of victim monies, and shell accounts.

B.    The Criminal Syndicate

16.    As of the filing of this Complaint, there are hundreds of victim transactions associated with this scam syndicate that operates primarily through the use of spoofed domains and is responsible for more than $80 million directly traceable to reported victim losses.  This scam syndicate is the same one involved in the complaint filed in Eastern District of Virginia case number 1:24-cv-2333, except that this Complaint mostly involves victims whose "investment" deposits were made in cryptocurrency rather than wires of fiat currency.  This syndicate took "investments" from victims both via cryptocurrency and fiat currency.

17.    This syndicate has been linked to the victims and transactions noted above based on, among other things, victim recruitment tactics, common website domain registration information, fraudulent exchange website appearance and functionality similarity, and shared cryptocurrency addresses and patterns of activity.

18.    With respect to victim recruitment tactics, victims were contacted on social media websites, including LinkedIn.  The scammers initiated a conversation and attempted to maintain a continuing relationship with the victim. Once the conversation had started, the scammer would request that the conversation move to the WhatsApp encrypted chat application.  The scammer would then continue the conversation on WhatsApp, and at some point, would begin talking about their successful cryptocurrency investments.  This would generally include a claim that they or a friend/relative had insider knowledge or a trading algorithm which allowed them to make large profits on their investments quickly. The scammer would then attempt to recruit the victim into investing in cryptocurrency using a specific exchange.

19.    Internet domain name registration information showed 874 website domains used by this syndicate that were linked by common registration information such as e-mail address,

phone number, and/or address.  All of the identified victims of this scam have used one of these 874 domains in order to access what they believed was their cryptocurrency investment account. Many of the domain names were variations on legitimate exchange websites. For example, one victim in this case used the URL "liquidunt.com" to access his account. This was a variation on "liquid.com", which was the URL for the legitimate cryptocurrency exchange Liquid.  Another victim used the URL "coinasx.com," a variation on "asx.com.au," the website for the Australian Securities Exchange.

20.    The fraudulent exchange websites in this scheme shared a similar appearance and functionality.  Many were identical, with the only change being the name of the site.

21.    The movement of victim funds and laundering techniques this syndicate used followed a similar pattern.  Once the victim sent the funds to the address provided by the fraudulent exchange, the funds were rapidly moved through multiple wallets.  During these transactions, the funds were often comingled with additional cryptocurrency, split into smaller amounts, and sent to multiple wallets.  During these transactions the funds were "swapped" for a different type of cryptocurrency and then moved through additional wallets.  This technique is known as "chain-hopping."  The swapping of the initial type of cryptocurrency sent by the victim for a different type was observed at least once in the trace of every payment by these victims, and often multiple swaps were observed.

22.    There was no legitimate purpose for these swaps, rapid movements between wallets, and splitting of funds between multiple wallets.  Rather, the syndicate used these techniques to conceal the nature, location, source, ownership, and control of the funds which had been obtained from the victims by wire fraud.  Each swap incurred a fee and both types of cryptocurrency being swapped were stablecoins pegged to the U.S. dollar, thus they were valued

at an equal amount.  Moreover, each swap and each one of the many transfers of the victims' cryptocurrency incurred a transaction processing fee, commonly known as a "gas fee."

C.    <u>Victim 1</u>

23.     Victim 1 is a 64 year old man living in New Kent County, which is the Eastern District of Virginia.  On or about January 7, 2023, Victim 1 was contacted via an unsolicited text message by a "Mina Lee" who claimed to live in New York City.  This contact by "Mina Lee" was entirely unprompted by Victim 1.

24.     After approximately 2 days, "Mina Lee" suggested that she and Victim 1 move their conversation to WhatsApp, an encrypted chat application.  On January 23, 2023, she requested that their conversation be moved to Telegram, a different encrypted chat application, which is where their conversations continued until they ended on April 30, 2023.  Then, "Mina Lee" told Victim 1 about her cryptocurrency investments and suggested to Victim 1 that he could make substantial profits through cryptocurrency investments.  "Mina Lee" told Victim 1 that she would show him how and when to invest and give him tips along the way.

25.     At the direction of "Mina Lee," on or about January 19, 2023, Victim 1 opened an account on what he believed was a legitimate cryptocurrency investment site called "Coinone". He accessed this site using the URL https://www.coin-topone.com, which was provided to him by "Mina Lee".  Victim 1 was notified on or about April 25, 2023 that the Coinone URL had been changed to https://coinoneusvip.com, and he subsequently accessed his account using this site.  Neither URL was a legitimate cryptocurrency investment site, rather they were spoofed websites controlled by the criminal syndicate described above.  There is a legitimate cryptocurrency exchange called "Coinone," which is based in South Korea and uses the URL coinone.co.kr.  The criminal syndicate used the name Coinone in an effort to appear legitimate,

though the two spoofed URLs described above were illegitimate and existed to steal victim-investors' money.

26.     Then, at the direction of "Mina Lee," on January 19, 2023, Victim 1 transferred $28,000 in fiat currency, U.S. dollars, from his bank account to another bank account in the name of LJS Remodeling.

27.     "Mina Lee" subsequently directed Victim 1 to open an account on Crypto.com, a legitimate cryptocurrency exchange. "Mina Lee" then instructed Victim 1 to purchase USD Coin (USDC), a cryptocurrency, on Crypto.com and then send the USDC to a cryptocurrency wallet address supposedly associated with his Coinone account, which Victim 1 did using the Crypto.com website and the fraudulent Coinone website. "Mina Lee" told Victim 1 that he would be able to withdraw his money from Coinone back to Crypto.com, where he could sell the USDC for fiat U.S. dollars. Victim 1 then began to conduct "trades" on the spoofed Coinone site by following instructions provided to him by "Mina Lee." By following her instructions he was able to see what he believed were profits accumulating in his Coinone account. On January 25, 2023, "Mina Lee" told Victim 1 that he should withdraw $500 worth of cryptocurrency from his Coinone account, so that he would understand the withdrawal process and would feel comfortable investing more in the future. He made a withdrawal request using the spoofed Coinone website, and was able to successfully receive 500 USDT in his Crypto.com account. USDT, also known as "Tether" is a US-dollar backed stablecoin similar to USDC. Victim 1 was told this was how withdrawals from his Coinone account would be issued.

28.     Subsequently, at the urging of "Mina Lee," Victim 1 transferred a total of approximately 287,518 USDC to his account on the spoofed Coinone website from January 27, 2023 to March 1, 2023. This resulted in his account on the spoofed Coinone website showing

that he had made profits resulting in a total balance of 1,135,216 USDC on March 1, 2023.  The 287,518 USDC sum sent by Victim 1 included not only Victim 1's "investments," but also "taxes" and "fees" that the spoofed exchange's "customer service" told him he was required to pay.  The spoofed exchange's "customer service" also told Victim 1 that he could not pay the "taxes" and "fees" out of his already-invested funds.

29.     On February 18, 2023, Victim 1 made a second withdrawal request using the spoofed Coinone website, attempting to withdraw approximately $40,000 worth of what he believed were his accumulated profits.  This withdrawal failed, and he was contacted by the spoofed Coinone's purported customer support service and told that he would have to pay taxes on any withdrawal over $1,000.  He was also informed that this payment could not come out of his account and had to be paid separately.  Based on this requirement, he sent additional 5,200 USDC on February 23, 2023, but was still unable to complete the withdrawal.  On March 1, 2023, Victim 1 made a withdrawal request using the spoofed Coinone website, attempting to withdraw all of his "invested" funds and purported profits, a total of 1,135,175 USDC.  In order to pay the "taxes" for this withdrawal, Victim 1 sent an additional three payments totaling 50,288 USDC from February 28 – March 1, 2023.  "Mina Lee" also encouraged him to make these payments by telling him that she would pay the remaining tax balance after he had sent the above amount.  Following these payments, he received a response from the spoofed Coinone's customer support service telling him that his withdrawal would be delayed for 30 days.  This delay continued, and on or about April 30, 2023, both "Mina Lee" and the "customer support service" stopped communicating with him.

30.     Ultimately, Victim 1 was unable to withdraw any of the funds he "invested" through the spoofed Coinone website, save the previously mentioned 500 USDT, and the criminal syndicate fraudulently obtained and retained Victim 1's funds.

D.     Victim 2

31.     Victim 2 is a 73 year old man living in Chapel Hill, North Carolina.  In November 2022, Victim 2 was contacted via LinkedIn by a "Linda Rong" who claimed to live in Beverly Hills, California.  This contact by "Linda Rong" was entirely unprompted by Victim 2.

32.     After "Linda Rong" initially engaged Victim 2 in communications, "Linda Rong" suggested that she and Victim 2 move their conversation to WhatsApp, an encrypted chat application.  Then, "Linda Rong" told Victim 2 about her cryptocurrency investments and suggested to Victim 2 that he could make substantial profits through cryptocurrency investments. "Linda Rong" told Victim 2 that she would show him how and when to invest and give him tips along the way.

33.     At the direction of "Linda Rong," in November 2022, Victim 2 opened an account on "liquidunt.com."  This URL was not a legitimate cryptocurrency investment site, rather it was a spoofed website controlled by the criminal syndicate described above.  There is a legitimate cryptocurrency exchange called "Liquid," which is based in Japan and uses the URL liquid.com. The criminal syndicate used the name Liquid in an effort to appear legitimate, though the spoofed liquidunt.com URL was illegitimate and existed to steal victim-investors' money.

34.     "Linda Rong" subsequently directed Victim 2 to open an account on Crypto.com, a legitimate cryptocurrency exchange.  "Linda Rong" then instructed Victim 2 to purchase USD Coin (USDC), a cryptocurrency, on Crypto.com and then send the USDC to a cryptocurrency wallet address supposedly associated with Liquid, which Victim 2 did using the Crypto.com

website and the spoofed liquidunt.com URL.  "Linda Rong" told Victim 2 that he would be able to withdraw his money from Liquid back to Crypto.com, where he could sell the USDC for fiat U.S. dollars.

35.     At the urging of "Linda Rong," Victim 2 transferred a total of approximately 826,440.51 USDC from November 12, 2022 to December 14, 2022.  This sum included not only Victim 2's "investments," but also "taxes" and "fees" that spoofed Liquid exchange's customer service told him he was required to pay.  The spoofed Liquid customer service also told Victim 2 that he could not pay the "taxes" and "fees" out of his already-invested funds.

36.     Ultimately, Victim 2 was unable to withdraw any of the funds he "invested" through the spoofed Liquid URL and the criminal syndicate fraudulently obtained and retained Victim 2's money until the U.S. Secret Service seized the money, along with other wire fraud proceeds which had been commingled with Victim 2's money, as discussed in sections E through G below.

E.      402,817.931 USDC seized from Binance wallet address
        0x9510c00aaac3561ef75f7b111edfcba1278333b6 ("0x9510")

37.     On December 1, 2022, at the direction of "Linda Rong," Victim 2 sent 69,900 USDC from his Crypto.com wallet to the address provided by the spoofed Liquid exchange for "investment."

38.     Between December 1 and December 23, 2022, Victim 2's funds were moved between numerous decentralized wallets, as detailed below, and mixed with additional cryptocurrency and converted to different forms, all with the intent to conceal and disguise the nature, location, source, ownership, and control of the funds obtained from Victim 2 by wire fraud.

39.     On December 23, 2022, 69,800 USDC of Victim 2's funds were sent to Binance wallet address 0x9510c00aaac3561ef75f7b111edfcba1278333b6 ("0x9510").

40.     On January 5, 2023, Binance froze 0x9510.  On January 26, 2023, the U.S. Secret Service obtained a seizure warrant for 0x9510 from a U.S. Magistrate Judge and executed that seizure warrant, resulting in the seizure of 402,817.92958 USDT.

41.     Of the 402,817.92958 USDT seized from 0x9510, 69,800 USDT is traceable to Victim 2's December 1, 2022 "investment" using the last in first out tracing method, where the most recently deposited credits are recorded as the next debit thereafter.  The remaining 333,017.92958 USDT from 0x9510 comes from other sources.  That 333,017.92958 USDT delta not only constitutes wire fraud proceeds from other victims, it also served to conceal and disguise the nature, location, source, ownership, and control of the funds obtained from Victim 2 by wire fraud.

42.     Wallet 0x9510 was most active between March 4, 2022 and January 5, 2023.  In that timeframe, approximately $37,121,952-equivalent in cryptocurrency was deposited in the account over 475 transactions, and approximately $36,884,490-equivalent was withdrawn over 247 transactions. The total amount of deposits and withdrawals from 0x9510 are roughly equal, indicating that the account holder was not the intended recipient of the funds.

43.     Deposits were generally withdrawn within one day, the majority for the same amount as the deposit, or consolidated with other deposits made around the same time and withdrawn together.  This pattern is indicative of a "mule" account, used to obscure the source and movement of illegitimate funds by layering them with funds from other sources.

44.     A large percentage of the total deposits and withdrawals for 0x9510 came from a small subset of addresses: 264 of the 487 deposits (56%) came from 8 addresses, and 166 of the

247 withdrawals (67%) were sent to 8 other addresses. This pattern is also suggestive of a "mule" account, with repeated transactions to and from the same addresses.

45.     Wallet 0x9510 also demonstrates the use of chain-hopping, as 47 of the 475 deposits were made on the Ethereum blockchain, while all 475 withdrawals were made on the TRX blockchain.

46.     Chain-hopping is a technique used to conceal the original source of cryptocurrency and to make it more difficult for law enforcement to trace the movement of cryptocurrency.  It consists of converting one form of cryptocurrency for another, often multiple times in close succession, or moving cryptocurrency from one blockchain to another, as some types of cryptocurrency can be traded on multiple blockchains.

47.     Chain-hopping is a common technique in the laundering of stolen cryptocurrency or cryptocurrency obtained from illegal activity.  Decentralized exchanges are often used in chain-hopping, as they allow one type of cryptocurrency to be converted to another while requiring the user to provide minimal or no identifying information.

48.     Finally, there were no purchases or withdrawals of any assets in 0x9510 from a traditional bank account, or any transactions to or from fiat currency.  In other words, all deposits and withdrawals were transferred in and out from other cryptocurrency addresses.

49.     Based on the characteristics set forth in paragraphs 37 through 48 above, wallet 0x9510's purpose was to receive large sums of cryptocurrency and quickly send it elsewhere. This was done with the purpose of concealing and disguising the nature, location, source, ownership, and control of the funds, which included wire fraud proceeds.

50.     A summary of the transfers from Victim 2 to 0x9510 is as follows:

a.    12/1/2022: Victim 2 sent 69,990 USDC from his Crypto.com account to 0x44427e, an address provided to Victim 2 by the spoofed Liquid exchange.

b.    12/1/2022: 69,990 USDC was sent from 0x44427e to 0xae20aa, a decentralized wallet. The USDC was sent to decentralized exchange Curve.fi and converted to DAI, minus a transaction fee, then sent back to 0xae20aa as 69,953.14 DAI.

c.    12/1/2022: 69,913.14 DAI was sent from 0xae20aa to 0x23955b, another decentralized wallet. While in this wallet the DAI was comingled with additional funds.

d.    12/2/2022: 733,052.483115 DAI was sent from 0x23955b to 0x3942cd, another decentralized wallet. The DAI was sent to decentralized exchange Curve.fi and converted to USDT, minus a transaction fee, then sent back to 0x3942cd as 733,052.483115 USDT, where it was comingled with additional USDT.

e.    12/2/2022: 735,126 USDT was sent from 0x3942cd to 0x3a3ec8, another decentralized wallet.  While in this wallet, the USDT was comingled with additional funds.

f.    12/2/2022: 1,500,000 USDT was sent from 0x3a3ec8 to 0x71fd4b, another decentralized wallet.

g.    12/3/2022: 1,500,000 USDT was sent from 0x71fd4b to 0xbf0734, another decentralized wallet. While in this wallet, the USDT was comingled with additional funds.

h.    12/4/2022: 3,000,000 USDT was sent from 0xbf0734 to 0x72bc11, another decentralized wallet.

i.    12/23/2022: 70,000 USDT was sent from 0x72bc11 to 0x0c0d86, another decentralized wallet.

j.    12/23/2022: 69,800 USDT was sent from 0x0c0d86 to 0x9510, the Binance wallet address which was ultimately frozen and from which the 402,817.92958 USDT were ultimately seized.

51.    A graphical representation of the aforementioned transactions is attached to this complaint as government's exhibit 1.

F.    <u>17,922.491314 USDT and 1,249,996.15 BUSD seized from Binance wallet address 0xf85db42fc79b153eac3725f0382fadaa34bae40a ("0xf85d")</u>

52.    On December 2, 2022, at the direction of "Linda Rong," Victim 2 sent 49,990 USDC from his Crypto.com wallet to the address provided by the spoofed Liquid exchange for "investment."

53.    Between December 2 and December 16, 2022, Victim 2's funds were moved between numerous decentralized wallets, as detailed below, and mixed with additional cryptocurrency and converted to different forms, all with the intent to conceal and disguise the nature, location, source, ownership, and control of the funds obtained from Victim 2 by wire fraud.

54.    On December 26, 2022, approximately 2,000,000 USDC was sent to Binance wallet address 0xf85db42fc79b153eac3725f0382fadaa34bae40a ("0xf85d").  This sum included Victim 2's funds.  This 2,000,000 USDC was automatically converted to BUSD by Binance.

55.     On January 5, 2023, Binance froze 0xf85d.  On January 26, 2023, the U.S. Secret Service obtained a seizure warrant for 0xf85d from a U.S. Magistrate Judge and executed that seizure warrant, resulting in the seizure of 17,922.491314 USDT and 1,249,996.15 BUSD.

56.     Of the 17,922.493576 USDT and 1,249,996.15007524 BUSD seized from 0xf85d, the 17,922.493576 USDT is traceable to Victim 2's December 2, 2022 "investment" using the last in first out tracing method.  The remaining 1,249,996.15007524 BUSD from 0xf85d comes from other sources.  The 17,922.493576 USDT was converted from BUSD to USDT by the wallet user.  The remaining 1,249,996.15007524 BUSD not only constitutes wire fraud proceeds from other victims, it also served to conceal and disguise the nature, location, source, ownership, and control of the funds obtained from Victim 2 by wire fraud.

57.     Wallet 0xf85d was most active between July 6, 2022 and January 6, 2023.  In that timeframe, approximately $62,618,632-equivalent in cryptocurrency was deposited in the wallet over 65 transactions, and approximately $62,697,509-equivalent was withdrawn over 77 transactions.  The total amount of deposits and withdrawals from 0xf85d are roughly equal, indicating that the account holder was not the intended recipient of the funds.

58.     The deposits were generally withdrawn within one day, the majority for the same amount as the deposit, or consolidated with other deposits made around the same time and withdrawn together.  This pattern is indicative of a "mule" account, used to obscure the source and movement of illegitimate funds by layering them with funds from other sources.

59.     A large percentage of the total deposits and withdrawals for 0xf85d came from a small subset of addresses: 52 of the 65 deposits (80%) came from 4 addresses, and 65 of the 77 withdrawals (84%) were sent to 4 other addresses. This pattern is also suggestive of a "mule" account, with repeated transactions to and from the same addresses.

60. Wallet 0xf85d also demonstrates the use of chain-hopping, as 46 of the 65 deposits were made on the Ethereum blockchain, while 60 of the 77 withdrawals were made on the TRX blockchain.

61. Finally, there were no purchases or withdrawals of any assets in 0xf85d from a traditional bank account, or any transactions to or from fiat currency. In other words, all deposits and withdrawals were transferred in and out from other cryptocurrency addresses.

62. Based on the characteristics set forth in paragraphs 52 through 61 above, wallet 0xf85d's purpose was to receive large sums of cryptocurrency and quickly send it elsewhere. This was done with the purpose of concealing and disguising the nature, location, source, ownership, and control of the funds, which included wire fraud proceeds.

63. A summary of the transfers from Victim 2 to 0xf85d is as follows:

a. 12/2/2022: 49,990 USDC was sent from Victim 2's Crypto.com account to 0x44427e, an address provided to Victim 2 by spoofed Liquid exchange.

b. 12/2/2022: 49,990 USDC was sent from 0x44427e to 0xae20aa, a decentralized wallet. The USDC was sent to decentralized exchange Curve.fi and converted to DAI, minus transaction a fee, then sent back to 0xae20aa as 49,965.66 DAI, where it was comingled with additional DAI.

c. 12/2/2022: 60,960.209 DAI was sent from 0xae20aa to 0x23955b, a decentralized wallet. While in this wallet the DAI was comingled with additional funds.

d. 12/3/2022: 479,871 DAI was sent from 0x23955b to 0x7ad5c5, another decentralized wallet. While in this wallet the DAI was comingled with additional funds.

e. 12/5/2022: 800,855 DAI sent from 0x7ad5c5 to 0x196d33, a decentralized wallet. While in this wallet the DAI was comingled with additional funds.

f. 12/5/2022: 3,000,000 DAI sent from 0x196d33 to 0x81e991, a decentralized wallet.

g. 12/6/2022: 2,000,000 DAI was sent from 0x81e991 to 0xa2c75e, a decentralized wallet. The DAI was sent to decentralized exchange Curve.fi and converted to USDT, minus a transaction fee, then sent back to 0xa2c75e as 1,999,804.869678 USDT.

h. 12/6/2022: 1,999,805 USDT was sent from 0xa2c75e to 0xa55c9b, another decentralized wallet.

i. 12/6/2022: 1,820,000 USDT was sent from 0xa55c9b to 0x483840, a decentralized wallet.

j. 12/6/2022: 663,097 USDT was sent from 0x483840 to 0x0ed4e7, a decentralized wallet.

k. 12/13/2022: 663,097 USDT was sent from 0x0ed4e7 to 0xc8abbe, a decentralized wallet.

l. 12/14/2022: 300,000 USDT was sent from 0xc8abbe to 0xe76591, a decentralized wallet.

m. 12/14/2022: 99,900 USDT was sent from 0xe76591 to 0x63902e, another decentralized wallet.

n. 12/16/2022: 99,900 USDT was sent from 0xe76591 to 0x63902e, a decentralized wallet. While in this wallet the USDT is comingled with additional funds.

o.    12/16/2022: 296,990 USDT was sent from 0x63902e to 0xbb4f12, a decentralized wallet. While in this wallet the USDT was comingled with additional funds.

p.    12/16/2022: 304,514 USDT was sent from 0xbb4f12 to 0xe4f410, a Binance account address. Based on account records received from Binance and the account owner's account activity log, this account belongs to a man in Hong Kong. Transaction records show that in the span of four minutes from being deposited, the USDT was converted to USDC and then withdrawn, as detailed below.

q.    12/16/2022: 303,600 USDC was sent from 0xe4f410 to 0x49cebc, a decentralized wallet. While in this wallet the USDC was comingled with additional funds.

r.    12/26/2022: 500,000 USDC was sent from 0x49cebc to 0xa6ee92, a decentralized wallet. While in this wallet the USDC was comingled with additional funds.

s.    12/26/2022: 2,000,000 USDC was sent from 0xa6ee92 to 0xf85d, the Binance wallet address which was ultimately frozen and from which the 17,922.493576 USDT and 1,249,996.15007524 BUSD were ultimately seized.

64.    A graphical representation of the aforementioned transactions is attached to this complaint as government's exhibit 2.

## COUNT 1
### (Forfeiture Under 18 U.S.C. § 981(a)(1)(C)
### as Proceeds of Wire Fraud in Violation of 18 U.S.C. § 1343)

65.     The United States incorporates by reference Paragraphs 1 through 64 of this complaint as if fully set forth herein.

66.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) or a conspiracy to commit such an offense."

67.     Title 18, United States Code, Section 1343 imposes a criminal penalty on any person who:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice…

68.     Title 18, United States Code, Section 1956(c)(7)(A) provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title."  Title 18, United States Code, Section 1961(1) lists "any act which is indictable under any of the following provisions of title 18, United States Code. . . section 1343 (relating to wire fraud)."

69.     As set forth above, the Defendant Property constitutes criminal proceeds of wire fraud, in violation of 18 U.S.C. § 1343.

70.     As such, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**COUNT 2**
**(Forfeiture Under 18 U.S.C. § 981(a)(1)(A)**
**as Property Involved in a Transaction in Violation of 18 U.S.C. § 1956)**

71.    The United States incorporates by reference Paragraphs 1 through 64 of this complaint as if fully set forth herein.

72.    Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title, or any property traceable to such property."

73.    Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal liability on "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

74.    As set forth above, the Defendant Property constitutes property involved in a violation of section 1956.

75.    As such, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**PRAYER FOR RELIEF**

WHEREFORE, the United States requests that judgment be entered in its favor against the Defendant Property; that pursuant to law, notice be provided to all interested parties to appear and show cause why the forfeiture should not be decreed; that the Defendant Property be forfeited to the United States and delivered into its custody for disposition according to law; that

21

the United States be awarded its costs and disbursements in this action; and for such and further

relief as this Court may deem just and proper.

Dated:  September 5, 2025

                                Respectfully submitted,

                                ERIK S. SIEBERT
                                UNITED STATES ATTORNEY

By:    /s/ Kevin Hudson_____
                                Kevin Hudson
                                Assistant United States Attorney
                                Virginia State Bar No. 81420
                                11815 Fountain Way, Suite 200
                                Newport News, VA 23606
                                Office Number: (757) 591-4000
                                Facsimile Number: (757) 591-0866
                                Email Address:  kevin.hudson@usdoj.gov

## VERIFICATION

I, Anna Freuler, Special Agent, United States Secret Service, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture *in Rem* is based on information known by me personally and/or furnished to me by various federal, state, and local law enforcement agencies, and that everything contained herein is true and correct to the best of my knowledge.

Executed at Raleigh, North Carolina, the 18th of August 2025.

Anna Freuler
Special Agent
United States Secret Service